The next case for argument is 17-1171, ECE v. Shulkin. This case is 17-1171, ECE v. Shulkin. Okay, Mr. Anderson, we're ready when you are. Good morning, Your Honors. May it please the Court, Brad Anderson, I represent the appellant, the Bryans, and BCE in this matter. This case asks the question of whether the government can accept the benefits and the performance of a contract that it knew was the result of fraud and therefore void ab initio. And you say they knew it was, I'm a little confused about how things went down here in the timing. You say they knew it was the result of fraud. Well, they didn't find out a lot of this stuff until discovery in terms of this litigation. But when you say they knew, is that because the contracting officer knew about some forgery? Yes. There are both undisputed facts that we relied upon in our cross motion for summary judgment that we believe were sufficient to allow us to enforce the contract. There were also disputed facts that we believe needed to be resolved against the government in order to solve the issue. So in some ways, I can understand the Court's confusion. I tried my best to break this into disputed facts and undisputed facts because we believe the undisputed facts support our position that the government is equitably estopped from being able to claim that this was a void ab initio contract. Let me ask you one preliminary question. I also find it hard to understand what's going on in this case. You defaulted on the contract, right? The government terminated the contract for cause as opposed to for convenience. So that's what we've appealed. But that termination was outside of all the arguments we're making here about what they knew and what they didn't know. Absolutely not, because when they terminated for cause, they then foreclosed on my client's bond, which then led to a personal liability against my clients. That's one of the acts. They terminated for cause because? Well, they said we weren't timely performing. Right, so their termination has nothing to do with the arguments you're making here about whether the contract was void ab initio or whether there was fraud and that sort of stuff, right? So I guess I'm having a hard time. Even if you were to prevail on all of those arguments, you defaulted on the contract and they terminated the contract on that basis. How do you prevail in terms of getting any relief? The whole case started with us appealing the termination for cause. In other words, we said you unlawfully or you wrongfully claimed that we were a default, and so that was the case. And then later on, the government amended its complaint shortly before the summary judgment and said, hey, this contract was void. And so then we got into the whole issue of whether we even had a right to claim the rights of a termination for cause versus convenience. So the case started off as an old-fashioned, we appealed the VA's determination. So even if you were to prevail on all of the second-tier stuff that we're arguing about here, all that would get you was you're back to square one, which is did the government properly terminate you for default in the first place. Precisely. That's what the case started off as. And then they said they got this teaming agreement through discovery, and they said, aha, we've caught you because this is a fraudulent contract. And so they changed it with an amended complaint right afterwards, filed the motion for summary judgment. There's nothing, it appears to me, unreasonable about their having done that when through discovery of this claim they discovered the matters that we're talking about here. Well, it is unreasonable when you think that they knew that the contract was void ab initio when the contract, well, first of all, when the contract was let out, when they gave the notice to proceed, they knew the contract was void. They didn't know about the stuff they discovered through discovery about the BCE, this teaming agreement and so forth. They didn't know about that. What you're claiming is they knew about is some other knowing of forgery or whatever, but not the teaming agreement. That only came out during discovery, correct? Right. And, again, I will address the teaming agreement because that seems to be their defense. But my point is they always knew that Singleton, who was convicted, had unlawfully forged my client's signature to the contract. They knew that. Why did he unlawfully force the signature when the teaming agreement gives Singleton full exclusive and complete authority and discretion in management and control of business and all set-aside contracts awarded to BCE? Okay, so the teaming agreement, first of all, Your Honor, the teaming… How was that an improper forgery when he actually had been given by your client express authority over all contracts? The teaming agreement, and this is important to understand, the undisputed facts about the teaming agreement was that my client, BCE, who had never weighed into federal contracting, did use the Singleton, who was infamous for doing the rent-to-vet program. To answer your question is he sends to my clients all of these documents that my clients needed to sign in order to get their bonding. The undisputed evidence was my client signed the last page of this teaming agreement, was never provided the first pages of the teaming agreement. Well, that's the problem with Mr. Singleton. I mean, how does that have any bearing here, whether your client was misled or not misled or how the background for this whole teaming agreement, the bottom line is the teaming agreement kind of disqualifies everyone. First of all, my client was… BCE was a qualified contractor. My client was a disabled vet, owned this company. This company had been around since 1999. So under the rules, BCE was qualified under the program to get these contracts. What the government is saying is this teaming agreement invalidated them because it's an illegal agreement. We agree that the teaming agreement, if effective, would have rendered my client ineligible. The point, and again, this is undisputed facts. If you look at the Veridine decision that they rely upon, if the government can prove under the special plea in fraud statute, if the government can prove that my client committed fraud by misrepresenting itself as a qualified contractor, then the Veridine decision kicks in and my client can't, on one hand, be a participant in the fraud and then claim that they are entitled to the benefits. So Singleton, I'm sorry, the VA and my clients were both victims of Singleton's fraud, a third-party fraud. In Veridine, the lower court, the Federal Court of Claims, had held, well, under an unjust enrichment theory, the contractor was entitled to the benefits that they put on the government. However, this court held, no, when the contractor is the one that committed the fraud, it's almost like unclean hands. They're not entitled to any benefits. In my case, it's different because the Bryans were as innocent or were not the ones that perpetuated the fraud. In fact, they participated in the conviction of Mr. Singleton. So that's the distinction that needs to be made here. And I want to make this point very clearly, is it wasn't until after the VA had foreclosed on my client's bond and Great American, the bonding company, had sued my clients out in Washington that we received this teeming agreement. We don't deny we signed the last page and shame on my clients for signing a bunch of documents that they didn't read, but the undisputed facts is that my clients didn't even receive the teeming agreement until it was provided in discovery in the federal lawsuit. Whatever page they signed, they were required to turn that over to the contracting officer in the first instance and they failed to do it. Whether they thought it was a five-page document or a one-page document, they didn't turn over what they were required to turn over, right? And as lawyers, we certainly tell our clients, don't sign anything unless you've got all the pages. We didn't have the document. We didn't have the document until later, but remember, Your Honor. But that's, I mean, I guess that's fine. I'll accept that as correct, but why does that matter? That doesn't obviate your client's obligation to turn something over. They were part of the contract, right? It wasn't part of the contract because remember, Your Honor, at the time that the offer was made, it was not made by VCE. It was not made by my clients. It was made by Singleton and we never authorized Singleton to submit the bid. We didn't authorize Singleton to sign. I mean, your whole basis for being here is that you want to enforce the contract. Obviously, you think you're a party to this contract. No. In October of 2010, my clients wanted to get back to Washington, they told the federal government, this is not something that my company has authorized. See? Here is the Ford signature. Singleton, who was starting. I don't understand. We started our conversation about ten minutes ago by talking about what you're really seeking here is there was a default. The government terminated the contract based on default and the underlying case, which you're seeking to pursue here, is that they shouldn't have terminated the case for default. You're part and party to arguing that your client's contract ought to have been enforced. No. I'm standing here telling you that when the Bryans were confronted with this forged document, they told the government, we don't want to perform. We want to repudiate. And you know what the federal government told my clients at that time is, no, we're not going to let you repudiate. If you try to repudiate, we're going to terminate your contract for cause and then we're going to go after your bond and the bonding company is going to come after you personally. And so my clients knew from the beginning, begged the government, please don't go forward with this because it's an illegal contract. Wait. When did this start after the discovery and the discovery of this team agreement? Well, the teaming agreement was discovered after we had appealed and we discovered it after the government had foreclosed on our bond. So what the government knew when they gave the notice to proceed is us saying, Singleton did not have our authority to sign this or to even submit this contract. He signed my name. He signed Jerry's name. He says, he frauded you. I wasn't. In fact, he was. The undisputed facts was that the contracting officer actually talked to Singleton, who said he was Jerry Kingan. Is Ms. Snyder qualified or authorized by the U.S. government to allow these folks, BCE, out of this contract? Or would that issue had to have gone through to adjudication? Is she personally qualified? You lost me. Can you ask the same question again? Is Ms. Snyder qualified? You say your clients went to her and wanted to be let out of this contract because they told her they never signed it, it was a forgery. Is she qualified to let them out of that contract? Oh, absolutely. Of course she's not. She's not a contracting officer with the U.S. government. She doesn't have the authority to bind. She is the contracting officer. Snyder was the contracting officer. Okay, wait. Let me back this up. Sure. So your clients have come in a scenario where things are awful and terribly behind on the contract. That was the state of affairs. They say to Ms. Snyder, well, we never signed this contract. And she says to them, well, I've got a signed contract here, and whether you signed it or not, you know, it has to be performed. I have confidence in your ability to do it. I'm recounting the facts as your person told them, not as she told them, as your person told them. And then your person says, she said to us, if we don't go forward, she would proceed to terminate the contract for default. And if a contractor does refuse to go forward, that is the proper course of action to terminate for default. And then he says at paragraph 37, with this threat, that if they didn't go forward, she would terminate for default, which I see nothing wrong with on her part. With this threat, Sherry and I told Ms. Snyder we would agree to go forward with the project. So they've got a contract signed by someone who, it turns out, was authorized by them in light of the teaming agreement to sign contracts on their behalf. We have them bringing this problem to the attention of the contracting officer, and we have her saying, listen, if you don't go forward, you're in default. And then them saying, okay, we'll go forward. I don't understand how that creates a knowledge in Ms. Snyder that makes the void ab initio at that moment in time. Okay, so there's a misunderstanding of the facts. And maybe in my attempt to be clear by setting out undisputed facts and disputed facts, here are the facts. It's that Singleton signs Jerry Ryan's name on the contract, which he didn't have the authority. Before you go to this, let's look at another fact, and that's that your clients were never eligible for SDVO, SB contracts to begin with, correct? No, they were. Jerry, in fact, he's 100% disabled now. Back then he was disabled. So he, the company. Singleton was not. Singleton was not, no. Going back to, Judge, did I answer your question? Going back to your question is the disputed facts. I'm sorry. Are you saying that BCE is eligible for SDVO, SB contracts? Yes. Yes. The only reason they would not have been is they are eligible. The teaming agreement is an illegal contract that would have rendered them ineligible if it had been implemented, but it was never implemented. Because Section 5 says the only way it's implemented is if there's a subcontract. And this teaming agreement was something we didn't know the terms of until after all of this occurred. But I want to go back to Judge Moore's question, because I think this is the heart of the case. Your Honor, before they gave the notice to proceed, so the contract was not being performed by anybody. It was the kickoff meeting, the notice to proceed. That's when my client said, we don't want this contract. It's void ab initio. They said, let's repudiate this. Not while it was being performed, at the outset. I think it's September 31st or October 1st. At the outset, we said, we never authorized Singleton to sign this. He forges Jerry's name. He was an imposter, which Ms. Snyder admitted and said that was unprofessional. But it was before the contract and the notice to proceed was let out that we said we want out. So, Your Honor, there's some confusion there, but our testimony was this happened before we swung the first hammer or did anything. So there was no contract from the beginning, because there was never any authority to Singleton to sign the contract. And it's pretty obvious when he signs my client's name. And my clients sit there and say, the first time they saw the contract was at the pre-meeting the day before. And they had to print it out for Jerry. And she said, that's not my signature. And they said, we just want to go back to the Northwest. We don't want to do this contract. And the contracting officer, who does have the authority to sign contracts and terminate contracts or accept a repudiation of a contract, said, I don't want to let this out again. I'm going to hold you to this. And, in fact, if you don't do the work, I'm going to put you in default. So, Your Honor, that's the facts of this case. I know when you apply equitable doctrines against the government, it's tough. High burden. This case, when you look at the facts and you see that we claim from the beginning, this is an invalid contract. We don't want to force it. But then I'll finish with this one to answer your question is, we did not want to perform the contract. They made us perform the contract. No, you agreed to. What's that? You agreed to. Well, with a gun to our head. No, you agreed under the threat of default. Yes. Which would have been appropriate because there was, in fact, a signed contract in place. Your client could have gone forward with his own litigation. He could have contested the contract and said, that person wasn't authorized to sign on behalf of me. Turns out the person was. But he could have claimed the person wasn't authorized to sign on behalf of me, but he didn't. Instead, he accepted the contracting responsibility at that point. His own testimony. Sure. I say gun to the head. Maybe that's inappropriate. But, yes, they could have made a choice. They could have gone to a lawyer and said, the government's going to make us perform under a void, not avoid, not avoidable, an illegal contract. They could have gone to a lawyer and said, no. But you also understand that, in the real world, people sometimes have to proceed. And, under the law, we have to mitigate our damages. It turns out it would never have been a void contract because Mr. Singleton did, in fact, have the authority to sign. He did not have the authority to sign. Under the team agreement, yes. That's not what made the contract illegal, the Ford signature. What made the contract illegal is a failure to certify this small business person's status. The undisputed evidence is we were certified on the web page, whatever that is. But the teaming agreement changed that status. It could have if the teaming agreement had been put into effect. So my clients were certified. They actually did that themselves where they qualified as a disabled vet program. If the teaming agreement had been put into effect, which was under Section 5 of the teaming agreement that required a subcontract, then it would have rendered. But they were obligated to disclose a teaming agreement to the VA. Well, that assumes, Your Honor, this is the whole, I'm running out of time, but that assumes that my clients actually authorized Singleton to bid on this project. He was not authorized. We still were the master of our domain. The difference, though, between the bid of the project and the signing of the teaming agreement, they knew they signed the teaming agreement. They knew they had signed a document. They hadn't received the document until later. They knew they had authorized this individual to proceed on their behalf, almost game cart launch authority over this particular project. That's a question of fact that we deny. But they did not disclose to the VA. But you can't deny it because the page they signed said, we agree to the enclosed teaming agreement. So you can't deny that they signed. You can say, okay, we didn't get the first five pages, the six-page document. But the six-page, the page they said they did get that they signed, says this is a teaming agreement on it, right above the signature. Sure. But they still had to authorize Singleton to bid on the particular contracts. They didn't authorize him to sign Jerry's name to it. So to say that they had a duty to disclose the teaming agreement to the VA, that's true only if the company had actually authorized a bid on that particular contract. I'll reserve the rest of my time. We're way out of time. So we'll restore two minutes for rebuttal and let's hear from the government. Thank you, Your Honor. So may it please the court. The board correctly upheld a termination for default position against BCE after BCE effectively admitted that it obtained the underlying contract by falsely representing that it was eligible for service-disabled veteran-owned small business contracts. Although BCE has raised a number of defenses, and you've heard some of those today, in response to the government's void of an issue argument, none of these defenses expressly rebut the allegation that BC falsely certified its status to obtain the contract. But what about his argument that he spent the last 10 minutes talking about, which is this should have never happened in the first place, because they forged the document and told that to the contracting officer. So this contract should have blown up at day one and we should have never gone through this. Respectfully, Your Honor, the forgery argument, as we've raised in our brief, is sort of a red herring in that it's designed to distract from the real issue, which is whether or not BCE was eligible in the first instance to receive the contract that it bid on and whether or not that was a proper basis for the termination. But getting into the question of the forgery issue, I think, as this Court has recognized, to the extent that BCE is arguing that Mr. Singleton did not have the authority to sign the contract when he did, first of all, the teaming agreement suggests that, in fact, he did have that authority. And Mr. Bryan's decision to sign the notice to proceed and continue performance on the contract and enjoy to perform the contract until they were terminated for default suggests that he ratified any improper signature in the first instance. Well, how does the teaming agreement make it clear that Singleton did have the authority when he actually signed the name of Jerry Bryan, not his own name? So if I authorize you to act on behalf of my company, you could sign your name on a document. That doesn't give you the right to sign my name on a document. That may be true, Your Honor. What the teaming agreement did do was it permitted Singleton to exercise full and exclusive control over the SDVOSB bids that were issued on behalf of BCE. As we understand now that that was effectively a legal teaming agreement in the first place because it was in order to perpetuate a fraudulent scheme. And so to the extent Mr. Singleton was not expressly authorized in a fraudulent document to sign on behalf of Mr. Bryan, that may be true. Mr. Bryan claims that he had no idea that Singleton was out there doing this and he had not intended to give Singleton any kind of exclusive authority to sign on behalf of us or control our contracts. He claims that he was unaware of the teaming agreement, which he may have signed the last page of, but he certainly didn't know that it authorized Singleton to do any of those things. Assuming for the sake of argument here that Mr. Singleton or Mr. Bryan was not aware of the full term of the teaming agreement, what the Bryans were aware of, what BCE was aware of, is that they had entered into a financial agreement with Mr. Singleton in order to bid on service-disabled, veteran-owned small business contracts. Where does Mr. Bryan admit that? Does he agree? It's admitted in five separate instances in the record. Show me where. First, in appendix 53, O53, BCE states, Singleton's involvement in the submittal of the bid may have also rendered BCE ineligible under the set-aside program rules. Okay, wait. Page 53, this is a brief that they submitted, what, to the lower court? To the CBCA, correct. Okay. So this is a brief they submitted, and what sentence do you want me to look at? It's the sentence that begins, Singleton's involvement. Page 53? Did you say 53 is the appendix? It's 53 of the appendix, and it's in the- It's not a paragraph, it's just a sentence. It's just a sentence. It's under the paragraph under header two, and it's the- Oh, there we go. And this starts with the second sentence. These are some of the sentences the board relied on in its decision. In the sentence, the third sentence that begins, Singleton's involvement, it goes, Singleton's involvement in the submittal of the bid may have also rendered BCE ineligible under the set-aside program rules. On page 54- Wait, but who's involved? Right. They're agreeing that, gosh, if we had signed this teaming agreement and done what it looks like people are claiming we did, then that would be a real problem. They're agreeing that that would have been a problem, that that would have rendered their company ineligible, but they're saying they didn't do it. Respectfully, Your Honor, I believe what they're saying in this document is that besides just the teaming agreement itself, they also acknowledge that there was a financial agreement, an agreement between the parties that they were aware of. Where? Where is that financial agreement? This is on page 54 of the document, the next page, under subheader two on page 54. On appendix 54, there's a sentence that begins, the Bryans nonetheless admit- It's the start of the second full paragraph under header two. The Bryans nonetheless admit that at the time Singleton submitted the forge bid on April 12, 2010, Singleton's financial arrangement with the Bryans likely would have made BCE ineligible under the set-aside program rule. And what that's referring to is the financial arrangement, whereas Mr. Singleton would provide what was needed for them to obtain bonding and obtain insurance and the arrangement that also included his assistance in obtaining these contracts in the first place in exchange for some dollar figure, some profit. That's the admission that the board relied on, and that's the admission that despite this question of whether or not the teaming agreement was in effect, that in effect the Bryans were aware of an agreement, of the existence of an agreement. He claims in his declaration that that agreement was that this guy was going to be his project manager and he's going to help and assist them on submitting bids and getting these contracts and teach them how to do this. That is what he says. That is what Mr. Bryans says in his declaration. Would that be the financial arrangement he's referring to? That I believe is to the extent they're not referring to the teaming agreement. That is theoretically the financial arrangement they're referring to, but what he also acknowledges is that Mr. Bryans was there in order to help him get bonds and insurance, things he didn't have. Mr. Singleton. Mr. Singleton, excuse me. Helping Mr. Bryans get bonds and insurance, things that Mr. Bryans did not have the finances in order to obtain in the first place. Do you know who's self-certified on the web, on VA's website, eligibility for the set-aside? The record reflects it. I'm not sure that the record before the court specifically identifies which person. I don't find anything in them. It doesn't identify which person is certified. What the record reflects is that BCE acknowledges that it authorized the certification on the Veterans Information Pages website that it was a set-aside, that it was an eligible set-aside for the purposes of this contract. Whether or not they authorized Mr. Bryans to submit a bid pursuant to that, BCE acknowledges that despite the existence of having a financial arrangement with Mr. Singleton, they did in fact certify and they authorized the certification on the VetBiz website. And it's that certification, not this question of forgery, that is central to the issue of whether or not they were properly awarded this contract in the first place. I want to get to a couple points that were made by BCE before the court here. One is the notion that BCE was qualified at the time it was awarded the contract as an SDV OSB. Originally, they raised the argument that in October 2010, when they continued with the notice to proceed, that they were eligible at that point in time. And they've subsequently in their reply brief now argued that at the time of the actual bid itself, they were eligible. With regards to the October 2010 eligibility, that's frankly not relevant to the question here, which is whether or not at the time they were awarded the contract, did they or did they not deprive another eligible contractor the opportunity to win this award? And even if it were relevant, BCE has admitted in its briefing and throughout the appendix, that Mr. Singleton, in fact, was still working for or at least working on behalf of BCE through the spring of 2011. So the notion that they disassociated themselves with Mr. Singleton is contradicted by their own statements. Who is John Kinsey? Your Honor, I'm not exactly sure who John Kinsey is, to be frank. I believe they say at one point that John Kinsey is the person who helped them submit the paperwork with relation to the certification. But they at other times in the record also say that Mr. Singleton was brought in to help them do the certification process in the first place. Well, at the appendix 26, in response to a question that said BCE admits that John Kinsey, not Singleton, assisted the brines in submitting paperwork for BCE to become eligible to bid on the set-aside contracts, it seems to me to read that BCE and John Kinsey worked side-by-side and they received some sort of help, but BCE was involved in that process. I believe that is what their response is to the requests for admission. Later on in the appendix, and I think this is at appendix 82. I apologize, I'm missing a specific site, but throughout the appendix there's sort of contradictory statements regarding the certification itself. But even if Mr. Singleton did not assist them with signing the certification statements for the purposes of the VetBiz website, it's clear that they retained Mr. Singleton or Mr. Singleton co-opted BCE in order to obtain these contracts prior to the submissions, prior to the bid in this case and prior to certifying on the VetBiz website. So Mr. Singleton, it appears, lured disabled veterans like Mr. Bryan into these fraudulent arrangements. What is his status now? I don't know Mr. Singleton's specific status. I know he was convicted of this scheme, of this renovate scheme in the district courts in Georgia. I don't know whether or not he's currently serving time or not or if he's out. I think there was a two-year sentence, but to be honest, it's not entirely clear to me at this point where he stands there. The other thing I want to, and maybe the court understands this and I'm simply, this is unnecessary, but one of the statements that was made is that this issue of fraud, forgery, was raised before the contract was let out. The contract was let, it was awarded in June 2010, June 11, 2010. The notice to proceed was simply a notice pursuant to the terms of the existing contract to proceed performance of the work. And if there are no further questions, Your Honors, I expect to request that the court affirm the decision of the court. Thank you.  Thank you, Your Honor. Page 103, I think, answers your question. It's a little bit inconsistent, but if you look at the, Michael, Mrs. Bryan, she's kind of the person that takes care of the paperwork for BCE. She says in paragraph five of her declaration, when we first started to bid on federal contracts, I worked with Mr. Singleton and the federal government to submit paperwork to become eligible under the service-disabled veteran-owned small business program. I remember receiving notice we had qualified and were on the list of eligible contractors. My point in front of the board was that if the teaming agreement was in effect, it was illegal. That's why he spent two years in prison, and that's why my clients distanced themselves, because about the time this contract was let out, the notice to proceed was when we started getting calls  I think it's really important when you distinguish the other cases, is that the government did not ever claim that we were a party to the fraud. They asked for our assistance to cooperate in the successful prosecution of Mr. Singleton. BCE never, and this is the key, this contract was void ab initio from the beginning, because even under the teaming agreement, which if it was in effect, it still required that Singleton get my client's approval on each contract that he was going to submit a bid on. I don't think that's the issue here. I think the issue is that the reason it was ab initio, it was void ab initio, is because they never did qualify for this set-aside program. The fact that there's a teaming agreement should have been notified, and it was never notified. That's contrary to the regulations that were before them. They should have known. You said it's sad or something like that, that they didn't read the contract. Well, legally it's too bad. They signed the agreements. They agreed and certified that they were eligible. They did not notify the VA about the teaming agreement, which would have stripped them of their eligibility. Your Honor, again, they were qualified if the teaming agreement went into effect after they were qualified. It would have rendered them disqualified. It would have been a fraud. They would have been the ones sitting in the pokey because they had committed fraud. So they were qualified. Look at Section 5 of the teaming agreement. It says there had to be a subcontractor. My point, and I can't drive this home any more clearly and I'll sit down, my point is that even under the teaming agreement, Singleton had to get my client's approval before bidding on or entering into the contract. He did not have the authority to bind my client to this contract, and he did not have the authority to sign Jerry Bryan's name, and the government knew that before they issued the notice to proceed. Can I ask a question about that? I don't want to belabor it, but just one quick question to make sure I understand. In the whole discussion you had earlier with Judge Moore, it seemed you said, well, we wanted to get out, as soon as we found out, we wanted out of this contract, and the contracting officer held a gun to our head and wouldn't let us out. But on Appendix 55, which your friend was pointing us to earlier, it says BCE has a right to enforce its agreement against the VA. They had an express contract which was oral and then confirmed in writing. Even though the contract was invalid on June 11th, there are facts to show that BCE and the VA later agreed to have BCE complete the void contract. So what is your position? I thought you were trying to argue here that they tried to get out of this, and this should have been declared void in the first instance. It seems like the argument here is that the government was bound by this contract with BCE. Two answers. One is the contracting officer, who knew that it was fraud, void, not voidable, void, as a matter of law, illegal contract. But am I wrong in reading that here you're making the argument and not disputing that they later agreed to have them complete the contract? Yeah, through four. And your argument is they had an express contract which was oral and then confirmed in writing. Yeah, because what they did is after the illegal contract they wouldn't let us out of, they signed four written modifications. And if you look at the written modifications, they all say, we hereby reassert the terms of the original agreement. So when Snyder signs that, she knows that the original contract is void. She signed three and then her replacement signed the fourth, saying we're adopting the terms of the original agreement. My argument, and we cite the cases, say that if the original contract is void, but you enter into a new contract that incorporates the terms of the first contract, you have a valid contract. Okay, thank you. So, yeah. I would thank both sides on the cases submitted.